292 F.2d 313
 LOCAL 346 INTERNATIONAL LEATHER GOODS UNION, AFL-CIO,
Respondent, Appellant,
v.
Raymond J. COMPTON, Regional Director Etc., Petitioner, Appellee.
INTERNATIONAL LEATHER GOODS, PLASTICS & NOVELTY WORKERS'
UNION, AFL-CIO, Respondent, Appellant,
v.
Raymond J. COMPTON, Regional Director Etc., Petitioner, Appellee.
 Nos. 5717, 5718.
 United States Court of Appeals First Circuit.
 July 19, 1961.
 
 Max H. Frankle, New York City, with whom Hipolito Marcano, Santurce, P.R., and Philip J. Ruffo, New York City, were on the brief, for appellants.
 Winthrop A. Johns, Asst. Gen. Counsel, Washington, D.C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marvin Roth, Atty., Washington, D.C., were on the brief, for appellee.
 Before WOODBURY, Chief Judfe, and MAGRUDER* and HARTIGAN, Circuit judges.
 WOODBURY, Chief Judge.
 
 
 1
 This is an appeal from an order of the United States District Court for the District of Puerto Rico entered on petition of the local Regional Director of the National Labor Relations Board enjoining and restraining the respondents-appellants, an international union and its local affiliate, from picketing the plants of Baronet of Puerto Rico, Inc., and Esco Corp. in Vega Baja and Morovis, Puerto Rico, pending final disposition by the Board of a charge filed with it by the corporations alleging that the respondent-appellant unions are and have been engaging in acts and conduct in violation of 8(b)(7) (C) of the Labor Management Relations Act, 1947, as amended by 704 of the Labor Management Reporting and Disclosure Act of 1959, 73 Stat. 544; 29 U.S.C.A. 158(b)(7)(C), quoted in the margin.[1] The basic question presented is whether the evidence supports the District Court's conclusion that picketing at the corporations' plants in Vega Baja, Puerto Rico, in April and May, 1960, was in violation of 8(b)(7) of the Act, that is, whether on the evidence it could properly be found that 'an object' of that picketing was 'forcing or requiring' the corporations to recognize or their employees to 'accept or select' the respondent-unions as the collective bargaining representative of the employees.
 
 
 2
 The facts in chronological order as found by the court below, as conceded by the parties, and as established by clear, convincing and for the most part uncontradicted evidence, are as follows:
 
 
 3
 Baronet of Puerto Rico, Inc., and Esco Corp., have adjoining plants in Vega Baja, Puerto Rico, where they engage in the business of manufacturing small leather goods. Esco has a similar plant in Morovis about twenty miles away. Although separately incorporated, Baronet and Esco are commonly owned, managed and controlled and have the same labor policy. Concededly they constitute a single employer for the purposes of the Act and therefore can appropriately and conveniently be referred to hereinafter in the singular as the employer. The same interests are also engaged in the same line of business in Reading, Pennsylvania, under the name of Baronet Leather Goods Corporation.
 
 
 4
 For some time prior to April, 1960, the appellant International Union had been seeking recognition as the bargaining representative of the workers at the Reading, Pennsylvania, plant, and during that month it extended its activities to the employer's plants in Puerto Rico. On April 18 International's president sent one Carlton Steger to Puerto Rico to represent the Union and to assist two Puerto Ricans, Dionisia Carillo and Eulalio Marcano, who had recently been appointed to the Union's staff. Steger described his function in Puerto Rico vis-a-vis the two new local staff members as: '* * * to help them to prepare organizational activities in numerous shops in Puerto Rico' falling within the jurisdiction of the Union, specifically including those of the employer and 'to acquaint them with organizational methods and techniques, to spend some time with them and to teach them what was expected of them as organizers of our Union.' A day or two after Steger's arrival in Puerto Rico he went to Vega Baja with the two new members of the Union's staff to meet the employer's workers in the highway outside the plants before and after work and at the noon hour and to distribute union circulars and membership cards. Apparently at about this time the local affiliate Union was organized.
 
 
 5
 On Thursday, April 21, two events of significance occurred, one in Reading, Pennsylvania, and the other in Vega Baja, Puerto Rico. On that day the International Union distributed handbills at the employer's Reading plant announcing that it had established a permanent office in Puerto Rico, that its organizing staff was 'now concentrating its efforts on your sister shops in Vega Baja and Morovis,' that 'International organizer Carlton Steger has been assigned to Puerto Rico to assist in coordinating our campaign to Unionize the Baronet empire,' and: 'The Union does not intend to permit Baronet to continue to play one shop against each other. We intend to negotiate decent contracts for all three plants in Reading, Vega Baja and Morovis, so that all workers are protected and to stop any further possibility of closing here-- there-- or anywhere.'[2] And in the evening of the same day, Thursday, April 21, the Union held an organizational meeting of the employer's workers in Vega Baja.
 
 
 6
 On the next day, Friday, April 22, the Union distributed leaflets at the employer's Morovis plant captioned in translation from Spanish: 'Become Union Members Now,' to which were arrached applications for membership in appellant International Union. Also on April 22 the employer laid off 33 women employees in Vega Baja, ostensibly for lack of work, but, according to a charge subsequently filed by the Unions, in reprisal for attending the union meeting the night before.
 
 
 7
 The next significant date is the following Tuesday, April 26, when picketing began at the employer's plants in Vega Baja. Some of the signs carried by the pickets protested the layoffs which had occurred the previous Friday. Other signs, however, read: 'Demandamos Reconocimiento de la Union' and 'Solicitamos El Reconocimiento de la Union' in translation: 'We Demand Recognition of the Union and We Request Recognition of the Union.' These latter signs were carried by the pickets for at least a day or two, perhaps until April 29 when Steger, who with Mr. Marcano had been in daily attendance at the scene of the strike showing the sign carriers how to picket, ordered them removed.[3] On April 29 persons identified with the strike in Vega Baja distributed leaflets at the employer's Morovis plant entitled in translation 'Baronet Staggers,' extolling the advantage on unionization and urging membership in the International Union.
 
 
 8
 On Monday, May 2, the Unions by their own admission openly assumed control and guidance of the strike but assert that they did so only for the purpose of supporting the strikers demand for reinstatement of the 33 women laid off on April 22. On that day signs ordered by Steger on April 30 appeared on the picket line bearing the legend in translation: 'International Leather Goods Union AFL-CIL Backs This Strike.'
 
 
 9
 On May 4, Senator Hipolito Marcano, billed in advance in a leaflet over the names of Steger and Marcano as a 'workers' attorney,' and President of the AFL-CIO in Puerto Rico and Senator of Puerto Rico, spoke to strikers in front of the employer's Vega Baja plants. The leaflet giving notice of his speech announced in capital letters that Senator Marcano would explain to the workers at both plants 'what the union means and the rights granted to strikers by the federal and state laws,' and in smaller print: 'We are winning the strike. No fellow worker is to be afraid in this great fight for the benefit of us all. Our Union as well as the organized labor movement in Puerto Rico of AFL-CIO is giving you 100% backing.'
 
 
 10
 There is credible evidence that from the beginning the picketing was accompanied by some disturbance, noise and confusion and that on more than one occasion truck drivers employed by third persons were deterred by mass picketing, perhaps for fear of violence but that is not entirely clear, from making deliveries to the employer's Vega Baja plants.
 
 
 11
 On May 5 violence broke out. Following a speech from a sound truck, in the highway in front of the employer's plants by one Marzan a crowd of more than 100 rushed the gates of the employer's plants shouting, throwing sticks and stones and breaking windows, and only failed to gain entrance because of intervention by the police.
 
 
 12
 In the meantime, on April 29, the employer had filed a charge with the Board's local Regional Director alleging acts and conduct by the appellant unions in violaion of 8(b)(1) and (7) of the Act upon which, after investigation, the instant petition under 10(l) for injunctive relief was filed in the court below. The appellants filed an answer and the court below after full hearing filed a memorandum opinion, findings of fact and conclusions of law on the basis of which it entered the order granting temporary injunctive relief from which this appeal has been taken.
 
 
 13
 The appellants concede that their agents were at the scene of the picketing from the beginning and actively controlled and directed the picketing on and after May 2, 1960. Their basic contention is that the evidence conclusively establishes that the picketing was solely and entirely in protest over the layoff of the 33 women workers on the Friday preceding the Tuesday on which the picketing began, and wholly fails to show that 'an object' of the picketing was at any time to force or require the employer to recognize or the employees to accept the Unions as the bargaining representative of the workers and therefore 8(b)(7) of the Act 'is totally inapplicable.' To support this contention counsel for the appellants strenuously objected to the introduction in the court below of evidence both oral and pictorial of the signs carried by the pickets on April 26 and for at least a day or two thereafter demanding and requesting recogntion of the 'Union' on the ground that there was no evidence identifying the 'Union' mentioned on the signs with the appellants or either of them. He argues his objection earnestly and at length in this court. We find no merit in it.
 
 
 14
 It is true that agents of two other unions, Seafarers International and Ladies Garment Workers were at the site of the strike from time to time. But there is no evidence that either of these Wichita, Kan., for appellant.
 
 
 15
 Richard Jones and Robert J. Roth, organize the employer's workers. Per contra the appellants when the picketing began had an active, open organizing campaign under way in Puerto Rico as part of a comprehensive program to organize the workers in all the employer's plants in Puerto Rico and Pennsylvania. Thus it must have been obvious to the employer's executives and to the workers as well, and perhaps also to the public generally in the small communities involved, that the 'Union' referred to on the signs was one or the other, perhaps both, of the appellants. The court below was not required to blind its eyes to a none too subtle subterfuge and neither are we. The further argument that there was no evidence that any agent of the appellants procured and furnished the signs is also without merit. Wherever the signs came from, they were carried by the pickets in plain sight of the appellants' agents, and if, incredible as it seems, Steger could not read them his colleague Marcano certainly could. Under the circumstances the signs alone are enough to support the District Court's conclusion that at least 'an object' (the statute does not require that the sole object) of the picketing was to force or require recognition of the Unions by the employer and selection of the Union by the employees as the bargaining representative of the workers.
 
 
 16
 On the facts outlined above in some detail, we have no doubt that the court below was entirely warranted in its finding that there was reasonable cause to believe that the appellants through their agents had engaged in unfair labor practices in violation of 8(b)(7) of the Act. And this conclusion warrants the grant of injunctive relief. It is true that application for that relief was made on the fourth day of the strike. But the relief was not granted until more than thirty days had elapsed since the strike began and therefore after the expiration of any period of time which, in the absence of a petition for election under 9(c), could be found under subparagraph (C) to be reasonable. Moreover, there is credible evidence in the record that the picketing was accompanied by disorder, confusion and violence, and that on occasion an effect of the picketing was to prevent deliveries to the employer's plants. Cf. Cuneo on Behalf of N.L.R.B. v. United Shoe Workders of America, etc., D.C.N.J.1960, 181 F.Supp. 324, 326.
 
 
 17
 Appellants' counsel has waived the contention that the injunction issued by the court below is too broad in that it covered the employer's Morovis plant where no picketing occurred. Other contentions of the appellants are either frivolous or else in view of the conclusion we have reached do not require discussion.
 
 
 18
 Judgment will be entered affirming the order of the District Court.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 '8(b) It shall be an unfair labor practice for a labor organization or its agentes--
 '(7) to picket or cause ot be picketed, or threaten to picket or cause to be picketed, any employer where and object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees, of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
 '(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of Section 9(c)(1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the resultes thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.'
 
 
 [2]
 The appellants' objection to the introduction of a copy of this handbill in evidence as an exhibit is without merit. While it might be objectionable for certain purposes it tends to prove that the International Union was embarking on a campaign to organize the employer's workers in Puerto Rico as well as in Pennsylvania and the opinion of the court below shows that it used the exhibit only for that purpose
 
 
 [3]
 Steger testified that he was wholly unfamiliar with the Spanish language and did not immediately understand the meaning of the signs. This seems hardly credible since the word 'Union' is the same in both Spanish and English and it is hard to see how any literate and even reasonably intelligent and imaginative person would not in the context used be able to translate the words 'Demandamos,' 'Solicitamos' and 'Deconocimiento' into 'We Demand,' 'We Request' and 'Recognition.'