Bernard **SAMOFF**, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**TEAMSTERS LOCAL 115, AFFILIATED WITH INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA**, Respondent.

Civ. A. No. 71-2528.

United States District Court,
E. D. Pennsylvania.

Feb. 8, 1972.

858

Robert Kaplan, Philadelphia, Pa., for petitioner.

Louis H. Wilderman, Richard H. Markowitz, Wilderman, Markowitz & Kirschner, Philadelphia, Pa., for respondent.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a petition brought by the National Labor Relations Board ("Board") for a temporary injunction under § 10 (*l*) of the National Labor Relations Act ("Act"), 29 U.S.C. § 151, et seq., alleging that the respondent, Teamsters Local 115 ("Union") has violated § 8(b) (7) (C) of the Act, in connection with its picketing of J. L. Popowich and Sons ("Company"), a Philadelphia firm engaged in the importation and distribution of watch bands. Section 8(b) (7) (C) prohibits picketing by a union which is not the certified representative where "an object" is recognition or organization, if the picketing is conducted for more than a reasonable period, not to exceed 30 days, without the filing of a petition for certification under § 9(c) of the Act. Section 8(b) (7) violations are among those unfair labor practices which Congress deemed sufficiently disruptive of commerce to include in § 10(*l*), which authorizes the federal district courts to grant temporary injunctive relief pending final action of the Board.

The picketing in question began on August 4, 1971. A petition for certification was filed on August 30, 1971. The gravamen of the Board's § 10(*l*) petition is that the picketing, from its inception, was accompanied by such threats and violence, directed towards the Company's partners, employees, customers and suppliers, that a certification petition filed 26 days later was not filed within a reasonable time.

We held an extensive hearing on the matter. At the hearing, the Board introduced substantial evidence in support of its allegations. The Union also introduced evidence: (1) denying that the pickets uttered threats or committed violence; and (2) denying that the picketing was organizational and recognitional in nature, asserting instead that the purpose of the picketing was to protest unfair labor practices by the Company, i. e., violations of §§ 8(a) (1) and 8(a) (3) of the Act, on account of which the Board (see *infra*) has filed a complaint against the Company. Our first task will be to make findings, to the extent permtited by our limited fact finding role, to resolve these factual disputes, and also another factual dispute which arises as follows.

The Union introduced evidence in support of an alternative argument, which commences with a virtual concession (confirmed in its Requests for Conclusions of Law) that at least part of the

initial purpose of the picketing was organizational. The Union asserts that, at the time it commenced picketing, it represented (by virtue of signed cards) the majority of the Company's production and maintenance employees, thereby entitling it to recognition. It then filed a petition charging the Company with an unfair labor practice under § 8(a) (5) of the Act for refusing to recognize it; such charge, if sustained, would present a valid defense to the Union violation of § 8(b) (7) (C).[1] The Regional Director, however, refused to issue a complaint charging an 8(a) (5) violation. The Union thereupon appealed the Regional Director's refusal to issue a complaint, but on November 16, 1971, the Board's General Counsel denied the appeal.[1a] The Union contends that, after the General Counsel's decision, the purpose of the picketing changed, and that the picketing thenceforward was solely to protest the Company's 8(a) (1) and 8(a) (3) violations and not for organizational or recognitional purposes. The Board denies that the picketing ever lost its organizational or recognitional content. While in view of the General Counsel's decision, and the case of Dayton Typographical Union No. 57 v. NLRB, 117 U.S.App.D.C. 91, 326 F.2d 634 (1963), discussed *infra*, it is not necessary to make a finding as to whether the Union in fact had a clear majority of the cards, it will be necessary to make a finding with respect to whether, after the General Counsel's decision, the purpose of the picketing changed.

The factual content of the case may be better understood if we first outline the legal questions raised by the Union's defense. These may be summarized as follows:

FIRST: Is the evidence sufficient for us to find reasonable cause to believe that the Union has violated § 8(b) (7) of the Act? Subsidiary questions are: (a) whether the refusal of a state trial judge to issue an injunction against acts of violence by the Union forecloses consideration of the threats and violence issue; and (b) whether it is proper to take the nature of the picketing into consideration (*e. g.*, whether it is violent or peaceful) in determining what constitutes a reasonable time under § 8(b) (7) (C).

SECOND: Whether, notwithstanding the 8(a) (5) dismissal, the Union's alleged status as the representative of a majority of the Company's employees is a valid defense to the § 8(b) (7) (C) charge against the Union.

THIRD: Whether violation of §§ 8(a) (1) and 8(a) (3) by the Employer can constitute a defense to the § 8(b) (7) (C) charge; and

FOURTH: Whether the provision of § 10(*l*) authorizing us to grant such relief as was deemed "just and proper" invokes the equitable doctrine of unclean hands and requires us to deny relief on

---

1. Int'l Hod Carriers Building and Common Laborers Union of America Local 840 AFL–CIO (Charles A. Blinne d/b/a C. A. Blinne Constr. Co.), 135 NLRB 1153 (1962).

1a. There is no further appeal available from that denial. Terminal Freight Cooperative Ass'n v. NLRB, 447 F.2d 1099 (3d Cir. 1971). The General Counsel's opinion, *inter alia*, stated:
"The Appeal is denied. The investigation disclosed substantial evidence of violence attributable to the Union, including threatening phone calls to non-striking employees, threats of assault and actual assaults against the owners and non-striking employees, vandalizing of Company property, forceable preven-

tion of pick-ups and deliveries, and forceable prevention of non-striking employees from entering the plant. The Union should not be free to obtain a bargaining remedy while engaged in conduct as reprehensible as the Company's, on which the Union relies for that remedy. *Cf.* Laura Modes Co., 144 NLRB 1592, 1596 (in which, contrary to the contention on appeal, the employer was found to have engaged in substantial 8(a) (1) conduct and ordered to reinstate unfair labor practice strikers (Id. at 1597–1599). Moreover, to the extent the opportunity for a fair election may have been impaired by the Company's unfair labor practices, such impairment may be considered diluted or balanced by those of the Union."

account of the Company's conduct; in the alternative, whether the "just and proper" language, as an expression of our equitable powers, or the proviso of § 8(b) (7), authorizes us to permit picketing to continue, with or without a hiatus or "quarantine" period, on the basis that it is also to protest unfair labor practices or, more to the point, solely to protest unfair labor practices in the wake of the unsuccessful 8(a) (5) appeal.

## II. *The Court's Fact-Finding Role*

■ Our fact-finding role in this case is a limited one. We are bound by the principles enunciated in Schauffler for and on Behalf of N.L.R.B. v. Local 1291, Int'l Longshoremen's Ass'n, 292 F.2d 182 (3d Cir. 1961), as follows:

> "[I]t must be borne in mind that a Section 10(*l*) injunction is interlocutory in nature and only remains in force pending the final adjudication of the Board with respect to the unfair labor practice charge . . . *The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present.* Nor need the Board conclusively show the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous. . . .
>
> ·  ·  ·  ·  ·  ·  ·
>
> "If, in a Section 10(*l*) proceeding, a district court or a court of appeals undertook to finally adjudicate such questions it would not be acting consistently with the congressional policy underlying Section 10(*l*) . . . Thus, the court would, to some extent,

usurp the Board's function as the primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme. . . . ." *Id.* at 187, 188 (emphasis added).

## III. *Findings of Fact*

Petitioner is Regional Director of the Fourth Region of the Board, and filed this Petition for and on behalf of the Board. We find that there is, and that Petitioner has, reasonable cause to believe the following facts:

During the month of July 1971, the Union commenced efforts to organize the Company's employees.[2] The Union organizers were soon successful in obtaining from among the employees of the Company many (executed) cards indicating a desire to join the Union and designating the Union as their bargaining representative.[3] On August 2, 1971, Joseph Yeoman ("Yeoman"), a Union Business Agent, in a face-to-face meeting, represented to management that he had in hand cards signed by a majority of the employees and made a formal demand for recognition. On the same day, in addition to this demand, Yeoman mailed a letter and a "recognition agreement" to the Company and made a recognition demand upon Jay Ochroch, Company counsel, informing him that if the Company did not recognize the Union, there would be a strike commencing August 4. The Company refused the demands, asserting that it would recognize the Union only if there were an NLRB election. On August 3, Yeoman met at the Union Hall with the Company's employees and told them that the Company did not recognize the Union and that they would, therefore, go on strike. On August 4, as promised, a number of the Company's

2. There is no dispute about the facts, essential to jurisdiction: (1) that the Company annually receives goods and materials from outside Pennsylvania valued at in excess of $50,000; and (2) that the Union is a labor organization within the meaning of the Act, with its principal offices at 4815 Old York Road, Philadelphia,

and that at all times mentioned herein, it it had been engaged within this jurisdiction in transacting business and in promoting and protecting the interests of its employee members.

3. The employees were earning $1.60 per hour.

employees did not appear for work but instead formed a picket line in which they were joined by Union employees and members from other plants in the Philadelphia area.

From the beginning, the picketing was accompanied by threats, epithets and violence directed to the Company's management (particularly, two of the firm's partners, David and Maury Popowich), its employees, customers and suppliers. The Company first became aware of the picketing as the result of an incident involving one Donald DeVillasanta. On August 4, at about 7:45 a. m., DeVillasanta, a supplier of the Company, was making a delivery to the Company's plant at 542 Green Street, Philadelphia. As he parked his truck he was approached by Yeoman, who stood at the rear of the truck, keeping him from letting the tail gate down, and who told him that he could not deliver there because of the picketing.

Yeoman also told him if he delivered he "would be sorry." Maury Popowich opened the door for DeVillasanta and accepted the delivery. After the delivery was made, Yeoman followed DeVillasanta in his car and, a short distance from the plant, cut off his vehicle in mid-block. Accompanied by another man, Yeoman approached DeVillasanta and told him that he was going to follow him back to his plant and tell his "employer" what he had done; that he could hurt him, "not physically"—but that he couldn't "stop the other pickets from hurting him physically."

On the same afternoon, David and Maury Popowich were preparing to deliver goods to the United Parcel Service ("UPS") terminal for shipment to customers outside Philadelphia. While attempting to load their station wagons, they were circled by the pickets who shouted obscenities of the worst character, and were repeatedly bumped into by Yeoman, who would then utter such statements as "if you bump into me, I'll kick your jew head in." When asked to move, the pickets refused, and it took

20 minutes to load the wagons. Yeoman and his compatriots then positioned their motor vehicles so that, en route to UPS, Maury Popowich was "sandwiched" between them. In addition to menacing him with sudden stops and starts and near sideswipes, at a point across the street from the UPS terminal they trapped him between their cars for 10 minutes; he was caught in the middle of the street and could not move. When they finally freed him to make delivery, the pickets attempted to persuade the UPS terminal people not to accept the "struck goods."

The bumping and blocking and threats at the Popowich loading dock were repeated on a regular basis after August 2. On a number of other occasions, the pickets led by Yeoman and one Cameron Laws ("Laws"), also provided a similar "escort" to the Popowich point of destination, and made threats and attempted to dissuade carriers from accepting delivery of goods at the point of destination. On one occasion, Maury Popowich was cut off on the road and nearly forced into a parked car in the midst of what turned into a 60 m.p.h. chase. On several occasions the carrier refused to accept the Company's goods. As the result of the picketing, carriers would not come to the Company's plant; instead, Maury and David Popowich would meet them at random locations to effect delivery.

On August 6, 1971, at about noon, David Guss, a 76-year old man, stopped into the Popowich plant to pick up an order of watch bands which he resells to jewelry stores. When he left, the pickets crowded around him, jostling and pushing him, and knocked the package from his hands. Each time he sought to recover the package it was kicked further away. Guss went back into the plant, pale and shaken. David Popowich then attempted to escort Guss out of the plant through the pickets. The pickets were standing in a group at the front of the steps. When David Popowich bent over to pick up the package, Laws kicked the package away and one of the other

pickets, William McNeill, "kneed" David Popowich in the groin and knocked him down. Maury Popowich then called the Philadelphia Police Labor Squad, who escorted Guss to his car.

The pickets' violence and menacing conduct was also directed against persons who continued to work for the Company during the strike. Linda Schnee, then age 16, and a 10th grade student at Little Flower High School, was working for the summer at the Company. Her friend, Margaret McConnell, was a full-time employee. They normally travelled to work together and called either David or Maury Popowich from a nearby gasoline station for an escort across the picket line, because of previous threats from the pickets. On August 9, at about 7:20 a. m., as they were approaching the gasoline station, two of the pickets, Maybelle Cockfeld and Teresa Bilone, came up behind them. Cockfeld threw a soda can at them and hit the back of McConnell's head. They grabbed Schnee by the hair and pushed her into a parked car, and then pulled her into the phone booth, banging her against the booth until she fell; they then pulled her up and threw her down, injuring her leg and head. Bilone dragged McConnell, as she was attempting to call the Popowichs, out of the booth and hit her across her face with her open hand. During the incident Schnee and McConnell were also subjected to vile epithets. After the incident, David Popowich picked Schnee up at her home and took her to work and drove her home in the evening. On a subsequent occasion, while the girls were working in the office, Cockfeld threatened to throw a brick at them.

There were numerous other incidents involving violence and threats. On one occasion, Maury Popowich was hit by Laws in the left ear. On another occasion, he was menaced by one of the pickets with a knife, and on still another hit with a rock in the ribs. One of the pickets named McCoy shoved David Popowich in the chest and menaced him with a bottle. On a number of occasions the pickets slashed the tires of Company vehicles with a stiletto. And on one occasion David Popowich was trying to drive out of the driveway in his station wagon when the pickets began to rock it. Thereupon, and amidst much laughter, one of the pickets lay down in the street and claimed that David Popowich had intentionally struck her with the vehicle, causing her to be injured. The picketing was also marked with the constant utterances of obscenities by the pickets at David and Maury Popowich and their employees.[4]

The incidents in question continued well into September and one incident (a threat with knife and club) occurred as late as October 26, 1971. The Police Labor Squad covered the picketing for eight to 10 weeks. During the pendency of the litigation, the situation has been quiet. The entire affair has resulted in a loss of business to the Company.

Turning again to the purpose of the picketing, we further find that there is, and Petitioner has, reasonable cause to believe the following facts. The picketing commenced for organizational and recognitional purposes. However, at an early point in the picketing, in addition to the objects of organization and recognition, the picketing sought to protest unfair labor practices by the Company.[5] By far the best of the Union's witnesses was John Morris, its Secretary-Treasurer. Morris, an experienced labor leader, testified that from its inception, the picketing was to protest violations by the

---

4. Inherent in our finding that there is reasonable cause to believe the foregoing facts, is the rejection of the testimony of Yeoman and six other pickets that absolutely none of these incidents happened. Particularly incredible was the testimony of Marie Storti, the first of the pickets to testify.

5. The picket signs generally made reference to a protest of unfair labor practices. However, in the context of this case, we do not consider the legend of the signs determinative, or even very significant.

Company of §§ 8(a) (1) and (3) of the Act, in addition to the Company's refusal to recognize the Union (§ 8(a) (5)). This contention was embodied in a formal charge which the Union made against the Company, on the basis of which the Regional Director issued a complaint. The complaint charged the Company with violations of § 8(a) (1) (interfering with employees in the exercise of rights guaranteed in § 7 of the Act) and 8(a) (3) (discriminating in regard to hire or tenure of employment or any term or condition of employment, thereby discouraging membership in any labor organization). More specifically, the complaint charged that David Popowich had: (a) interrogated employees concerning their Union membership activities and desires; (b) told employees that he knew who had signed cards, creating the impression of surveillance; (c) promised employees a pension and wage increases if they refrained from assisting or supporting the Union; (d) visited striking employees at their homes and promised them a $10 bonus and increased wages if they abandoned the strike and returned to work; (e) paid employees a bonus of $10 per week to discourage them from supporting the Union; and (f) terminated and failed to reinstate employee Roslyn Hightower, because she joined or assisted the Union. We deem these to be serious charges.

However, throughout the course of the picketing, the Union retained the goal of organizing the employees and seeking recognition. The certification petition also remains on file, which means that a Board election will ultimately be held. Therefore, while one object of the Union's picketing was to protest unfair labor practices, another object of the picketing was and is to force or require the Company to recognize or bargain with the Union as the representative of its employees or to force or require the employees to accept or select the Union as their collective bargaining representative, notwithstanding that the Union is not currently certified as the representative of the employees. We cannot accept Morris' contention that the organizational-recognitional purpose of the picketing was abandoned, either following the General Counsel's decision on the § 8(a) (5) appeal or at any other time. As we view the facts (see further discussion, *infra*) the organization and recognition are at the heart of this case, and cannot be ignored in the court's determination.

The picketing has induced individuals employed by suppliers, service companies, carriers, and other persons not to make pickups or deliveries at the Company's premises, and other locations picketed. Moreover, the conduct of the Union has a close, intrinsic and substantial relation to trade, traffic and commerce among the several states [6] and tends to lead and does lead to labor disputes burdening and obstructing commerce and the free flow of commerce. Finally, it may fairly be anticipated that, unless enjoined, the Union will continue or repeat the acts and conduct set forth above, or similar or like acts, and conduct.

Having set forth our findings of fact, we now turn to a discussion of the applicable legal principles.

## IV. Is There Reasonable Cause to Believe that the Union has Violated § 8(b) (7) (C)?

We have set forth in our preliminary statement the legal questions raised by the case. We need not tarry long in stating our response to the first of them: the evidence is more than sufficient for us to find reasonable cause to believe that the Union has engaged in unfair labor practices within the meaning of § 8(b) (7) (C) of the Act, affecting commerce within the meaning of §§ 2(6) and (7) of the Act, and that a continuation of these practices will impair the policies of the Act as set forth in § 1(b) thereof, and we so find. It is necessary, however, that we comment

---

6. The Company's annual gross sales are in the neighborhood of $1.5 million.

upon the points raised by the Union in opposition to this conclusion.

■ First, we do not consider that the refusal of Common Pleas Judge Cody, after hearing, to continue a temporary restraining order granted *ex parte* against acts of violence by the Union, is conclusive on the issue of the Union's conduct. Not only were the issues before Judge Cody different from those before us (and the Board was not a party), but all Judge Cody decided was that "there has been no showing of a situation with which the ordinary forces of law and order cannot adequately cope."

■ We also have no difficulty with the conclusion implicit in the above-stated ultimate finding, but stemming from the evidence, that the Union's election petition, although filed within 30 days, was not filed within a reasonable time. The Union's contention that we are writing into the Act something that is not there, *i. e.*, taking the nature of the picketing into account in determining what constitutes a reasonable time, is effectively answered by the decision of the Board in District 65, Retail Wholesale and Department Store Union AFL–CIO (Eastern Camera and Photo Corp.), 141 NLRB 991, and the decision of the Court in Cuneo on Behalf of N.L.R.B. v. United Shoe Workers of America, AFL–CIO (Q.T. Shoe Manufacturing Company), 181 F.Supp. 324 (D.C.N.J.1960), which we elect to follow.

Section 8(b) (7) (C) reads, in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—

. . . . . .

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

. . . . . .

"(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing. . . ."

In *District 65*, the Board held that Congress intended that the Board should determine what constitutes a reasonable time in each case. In *Cuneo*, the Court stated:

"Peaceful picketing, as done in so many instances, does not constitute a menace to free choice of a bargaining representative. But threats and a series of untoward instances immediately subsequent to the initiation of the organizational strike, and before filing of a petition for election of a bargaining representative, may constitute such an unfair practice as to warrant the issuance of an injunction. There seems to be no question in the instant case that free choice has been improperly inhibited to the point that the court is warranted in concluding that the application for selection of a labor organization as the collective bargaining representative has been unduly delayed. *The unlawfully aggressive nature of the picketing and its coercive effect on the employees have combined in the instant case to shorten the period for which the Union may reasonably be allowed to picket before seeking the impartial intervention of the Board."* (Emphasis added.)

When the legislative history of § 8(b) (7), a 1959 amendment to the Act, is reviewed, it becomes clear that the purpose of the section was to correct the absence of adequate restriction on organizational and recognitional picketing by requiring that disputes over representation of employees be settled through Board procedures rather than by coercive picketing. In light of that Congressional purpose, there is nothing more rele-

vant to the question of what constitutes a reasonable time than whether the picketing is peaceful or coercive.

■ We have found that the picketing had more than one purpose, but that does not make such conduct lawful as long as *an* object of the picketing is proscribed by § 8(b) (7) (C) (as it was in this case). *See* Local 346 International Leather Goods Union v. Compton, 292 F.2d 313 (1st Cir. 1961); Department & Speciality Store Employees' Union v. Brown, 284 F.2d 619 (9th Cir.), cert. denied, 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961); Joiner, Inc., 135 NLRB 876; *see also* NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 71 S. Ct. 954, 95 L.Ed. 1299 (1951); Local 74, United Brotherhood of Carpenters & Joiners Corp. v. NLRB, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309 (1951). The cases cited by the Union on this point, Sachs v. Plumbers Local Union No. 5, 307 F.Supp. 190 (D.C.C.1969), Local 259 United Auto Workers and Fanells Ford Sales, Inc., 133 NLRB 153, National Packing Company, Inc., 147 NLRB 55, 62 LRRM 1260, are inapposite because they involve situations where the picketing was found to be totally for purposes *other* than organization or recognition.

## V. Is the Union's Alleged Majority Status a Valid Defense to the § 8 (b) (7) (C) Charge?

■ Notwithstanding the fact that the Union's § 8(a) (5) charge has failed,[7] the Union has in effect asserted that its (alleged) status as the representative of a majority of the Company's employees is a valid defense to the § 8(b) (7) (C) charge. It does so in the form of its assertion that, since the Union had cards signed by the majority of the Company's

production and maintenance employees, the picketing was not "blackmail picketing" which § 8(b) (7) (C) was intended to eliminate, and that § 8(b) (7) (C) is therefore inapplicable to the facts. This argument, however, has been answered by holding of the Court in Dayton Typographical Union No. 57 v. NLRB, 117 U.S.App.D.C. 91, 326 F.2d 634, 636 (1963). After an exhaustive review of the legislative history of § 8(b) (7), the Court stated:

"The Union contends that picketing under such circumstances is not forbidden, basing its argument on evidence in the legislative history that the evil which prompted Congress to include the section was 'blackmail' picketing by a union not lawfully entitled to recognition as representing a majority of the employees. It is indisputable that this was the evil with which Congress was predominately concerned. It is equally beyond argument, on the other hand, that the clear language of the statute, as it was ultimately enacted, which exempts from its operation only a 'labor organization [that] is currently certified,' goes far beyond mere correction of that evil. It negates a view that a union, merely by virtue of its majority status, but without the filing of a petition or having current certification, can picket for recognition beyond the thirty-day period fixed without incurring sanctions. Our construction not only appears to be required by the language used but it effectuates the apparent purpose of Section 8(b) (7), subject to the limitations and provisos therein expressed, 'to encourage prompt resort to the election machinery, rather than protracted picketing, as the method for resolving representation questions.'"

We agree with the Dayton Court's view of the purpose of § 8(b) (7).

---

7. Had the 8(a) (5) charge succeeded, it would have established that the Company was wilfully refusing to recognize the Un-

ion, thereby mooting the representation question.

VI. *Do the Company's (alleged) Violations of §§ 8(a) (1) and (3) Constitute a Defense to the § 8(b) (7) (C) Charge?*

■ We turn now to the question raised by the Union of whether violations of §§ 8(a) (1) and 8(a) (3) by the Company can constitute a defense to the § 8 (b) (7) charge. We hold that it cannot. A lengthy exegesis of this point is made unnecessary by the definitive opinion of the Board in the case of Int'l Hod Carriers Building and Common Laborers Union of America Local 840 AFL–CIO (Charles A. Blinne d/b/a C. A. Blinne Constr. Co.), 135 NLRB 1153 (1962), which we believe to be a correct statement of the law. In *Blinne,* the Board held that only employer violations of § 8 (a) (2) [8] and § 8(a) (5) are valid defenses to a union's violation of § 8(b) (7) (C) and, consequently § 8(a) (1) and (3) violations are not a defense. The facts in *Blinne* are somewhat different from the facts here, in that in *Blinne* no petition was filed within the 30-day period. However, in view of our finding here that (there is reasonable cause to believe) the Union's petition was untimely even though filed within the 30-day period, the cases are parallel.

A union faced with employer violations of § 8(a) (1) or § 8(a) (3) is fully protected if it files a timely and proper petition for election. In that circumstance the Union may continue to picket during the extended period of time in which the employer's violations would be remedied and the effects of those violations on employees (*i. e.,* voters) would be dissipated prior to the holding of a representation election. On the other hand, the failure to file a timely petition for election frustrates the legislative scheme which permits a reasonable period of recognitional or organizational picketing but requires, thereafter, a resolution of the representation question through the Board's election process. (Of course, an election will ultimately be held in this case.)

Although we consider the § 8(a) (1) and (3) charges against the Company to be serious indeed, under the applicable law they cannot constitute a defense to the § 8(b) (7) charge against the Union.

VII. *May We Apply the Doctrine of "Unclean Hands" or the § 8(b) (7) Proviso to This Case?*

■ During the hearing, anticipating that we might follow the holding of the Board in *Blinne,* but continuing to press the impact on this case of the § 8 (a) (1) and (3) charges against the Company, the Union suggested that the provision of § 10(*l*) authorizing us to grant such relief as we deem "just and proper," authorizes us to deny injunctive relief by application of the equitable doctrine of "unclean hands." Our research reveals that we cannot do so.

Judge Van Dusen stated the applicable law clearly in his opinion in another § 10(*l*) case, Schauffler v. Brewery and Beer Distributor Drivers, etc., 162 F.Supp. 1, 9 (E.D.Pa.1958):

> "Injunctive relief is traditionally equitable in nature. . . .
>
> .    .    .    .    .    .
>
> "This case involves more than a request for an injunction under common law. It is brought under statutory law and the grant of the injunction depends upon the standards set forth in the statute. The Court of Appeals of this Circuit has expressly disclosed that the clean hands doctrine is not applicable in a proceeding where a government agency is seeking to enforce its order in the public interest. Since the fact finder in these cases is the Board, it is held that if the court finds reasonable cause to uphold the Board's charges, the injunction shall issue."

*Accord*: Eichleay Corp. v. NLRB, 206 F. 2d 799 (3d Cir. 1953) (the Third Circuit case referred to by Judge Van Dusen); Samoff for and on Behalf of N.L.R.B. v. International Longshore-

---

8. No § 8(a) (2) violation is alleged in this case.

men's Ass'n, 188 F.Supp. 308 (D.Del. 1960); Schauffler for and on Behalf of N.L.R.B. v. Local 1291, Int'l Longshoremen's Ass'n, 188 F.Supp. 203, 211 (E.D. Pa.1960).

Having stated the law, we feel constrained to observe that there must be some cases where the conduct of the employer is so damnable that, notwithstanding the public character of the lawsuit, the Court, out of conscience, ought to be permitted to apply the "unclean hands" doctrine, and deny injunctive relief that benefits a wrongdoer. In making this observation, we are not unmindful of the historic Congressional fear of federal courts becoming too deeply involved in labor disputes without the aid of initial adjudication by an expert agency, and the reticence of Congress to confer injunctive power upon federal judges in labor disputes. However we are also not unmindful of the preeminent importance in our scheme of labor relations of the right to picket. Once conferred with § 10(*l*) jurisdiction, it would seem preferable that the Court have broader options in reaching a "just and proper" decision than the present state of the law allows. Although we have searched the legislative history of § 10 (*l*) in vain for a discussion of the reasons for the use of "just and proper", we believe that the result we suggest is justified by the use of "just and proper" in the Act, and we hope that, in the appropriate case, the appellate courts will reexamine the question. However, in view of the precedent we are bound to follow, we cannot apply the doctrine of "unclean hands".[9]

In a variant of the "unclean hands" approach, the Union has raised two further points in its brief:

FIRST:

"Even if this Court were to find that an organizational or recognitional object of the picketing still exists along with an object of picketing in protest against the Section 8(a) (1) and (3) Unfair Labor Practices committed by Popowich, it would not be just and proper to enjoin the Respondents from all activities until there has been a determination by the National Labor Relations Board that the Respondents have, in fact, committed Unfair Labor Practices. . . . ";

"[E]ven if it be found that Local 115 did engage in acts of misconduct, this Court should, as does the National Labor Relations Board, balance the severity of Popowich's Unfair Labor Practices in order to determine whether Popowich's Unfair Labor Practices provoked the misconduct and/or whether Popowich's Unfair Labor Practices would justify the severe penalty of 'enjoining' or 'quarantining' picketing by Local 115, while at the same time letting Popowich go scot-free . . . ." See NLRB v. Thayer Co., 213 F.2d 49 [748] (10th [1] Cir.), cert. denied 54 [348] U.S. 883 [75 S.Ct. 123, 99 L.Ed. 694], 1954; Local 833 v. NLRB [112 U.S.App.D.C. 107], 300 F.2d 699 (D. C.Cir.), cert. denied 370 U.S. 911 [82 S.Ct. 1258, 8 L.Ed.2d 405] (1962). . . ."

The second point is quickly answered. The *Thayer* and *Local 833* cases are inapposite because (1) they are cases in which the Courts of Appeals were asked to enforce orders of the Board, not review decisions of the District Court; and (2) our limited role in accordance with the cases does not permit us to apply a "balancing test" as does the Board. However, the first point is buttressed by two cases cited by the Union which are closer to the point and require discussion.

In Samoff for and on Behalf of N.L. R.B. v. Building & Construction Trades Council of Phila. & Vicinity, 236 F.

---

9. We note that some of the 2nd Circuit cases give an inkling of the use of an equitable "balancing test": McLeod for and on Behalf of N. L. R. B. v. Local 25, Int'l Bro. of Elec. Wkrs., 344 F.2d 634, 639, opinion by Marshall, J. (now Mr. Justice Marshall); Douds v. Milk Drivers and Dairy Employees Union Local 584, 154 F.Supp. 222, 236 (D.C.).

Supp. 120 (E.D.Pa.1963), our respected colleague Judge Luongo had before him a § 10(*l*) petition brought by the Regional Director charging § 8(b) (4) and § 8(b) (7) violations against the Union. In that case, a non-union general contractor, who was involved in construction of a motel, had engaged a number of non-union subcontractors. The contractor was visited by representatives of the Building and Construction Trades Council, who demanded that subcontracts be awarded to union subcontractors, and threatened that if union subcontractors were not employed, the job "would never get off the ground". Alternatively, the union representatives suggested ways in which self-employed equipment operators working on the job could be required to join the union. When the general contractor would not accede to the union's various requests, picketing commenced, attended by threats, obstruction of equipment and numerous acts of violence. The legend of the picket signs asserted that the object of the picketing was to protest the destruction of prevailing area wage standards and conditions by those working on the motel.

Judge Luongo found that the Director had reasonable cause to believe that, among the objects of the union's picketing, were organization and recognition, proscribed by § 8(b) (7) (C) (the Union had filed no § 9(c) petition), and secondary boycott, proscribed by § 8(b) (4). The Director had sought a total bar on the Union's activity until disposition of the charges by the Board, which was expected to take five months or longer, by which time construction of the motel, the site of the picketing, would have been concluded. However, Judge Luongo observed:

> "It does not impress me as 'just and proper' to enjoin respondents from *all* activity before there has been a determination, on the merits, that they have in fact committed unfair labor practices. I am not nearly as convinced as the petitioner seems to be that the protest against destruction of area standards is sham. Until the

Board has made its determinations, respondents should be permitted to make known to the public and to persons dealing with them that specified employers on the job are not paying the wages and observing the conditions which other employers in the industry are, providing the information is imparted in a way to make it clear that that is the sole object of the picketing."

Judge Luongo thereupon concluded that, in light of the facts, it would be "just and proper" to require a reasonable period of time during which there would be a complete ban on picketing (he set that period as two weeks) to serve as a "change of pace", after which he permitted limited picketing, subject to conditions, including approval by the Court of the legend on the signs.

We find the Samoff, etc. v. Building and Construction Trades case inapposite here. The organizational and recognitional aspects of that case are considerably muted against the principal questions involved. Judge Luongo was apparently satisfied that the area standards theme was a dominant aspect of the picketing, and that at the time of his decree, the organizational and recognitional aspects of the case (which were somewhat ephemeral) were out of the picture, or could be removed from it, and the picketing limited to the area standards question. In the present case, the organizational and recognitional aspects of the picketing are at the heart of the matter: they are what the dispute is all about. The Union has not and realistically cannot abandon its organizational and recognitional desire here.

The *Samoff* decision did not articulate any reliance upon the proviso in § 8(b) (7) (C), which reads as follows:

> "Provided further, that nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to

induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services."

The proviso was, however, the determinative factor in the court's permitting informational picketing to replace organizational picketing, even without a court ordered hiatus or quarantine in Kaynard v. Knitgood Workers Local 155, F.Supp., 64 LRRM 2838 (E.D.N.Y. 1967).[10]

In *Kaynard,* the union commenced picketing with the object of organizing the employees of Boulevard Knitwear Corp. in mid-October (1966). In early November, Boulevard filed § 8(b) (7) (C) charges against the union and a petition for an election among the employees. The picketing continued (no complaint was issued on the unfair labor practice charge), and an election was held in early December which the union lost. The picketing continued through mid-December, at which time Boulevard filed another § 8(b) (7) (C) charge. The union thereupon, by letter to the Board with a copy to Boulevard, announced its intention to suspend picketing for one week so as to "disassociate the resumed picketing from the prior picketing in order to avoid any misunderstanding as to the object of the picketing when resumed. . . . " The purpose of the resumed picketing was stated to be to give publicity to the fact that the employment conditions of Boulevard's employees were below area standards; any organizational or recognitional purpose was expressly disclaimed. When the picketing resumed, the picket signs reflected the stated purpose.

Judge Dooling found that the Regional Director had reasonable cause to believe that until mid-December, the purpose of the picketing was organizational and that the union had violated § 8(b) (7) (C), but that the picketing since late December (*i. e.,* after resumption) had

no such purpose, and was limited to publicity about Boulevard's non-conformity to area standards, and the forcing of Boulevard to extend to its employees wages, working conditions and other employment benefits equal to the union's minima for the area. Judge Dooling also found:

"[I]t was evident to respondent, the Company and its employees that the new picketing signified continuing Union interest in the Company, its employees and the wages and other working conditions of the Company's employees, and that unionization of the shop with respondent's local would end the economic pressure exerted by the picketing; the picketing did not, however, solicit, force or require recognition or union membership, but was calculated, through publicity, to eliminate the alleged wage inequality by appealing to employees and to potential customers."

In what we find to be a remarkably perceptive exegesis of the proviso of § 8 (b) (7) (C), Judge Dooling observed:

"Section 8(b) (7) (C) of the Act permits a narrow range of informational picketing aimed at the public that is not interruptive of deliveries or service to the employer in the same breath that it forbids the continuation of picketing for recognition or to organize a shop beyond a reasonable time for petitioning under Section 9(c) of the Act to settle any question of recognition or representation. Implicit are the ideas that the law permits picketing to organize and to gain recognition unless irrationally protracted and permits picketing to inform the public and consumers that an employer has no contract with the picketing union (if that does not induce interruption of service or deliveries to the employer which is being picketed)—so long at least as the latter picketing has not as an object forcing or requiring recognition or unionization

---

10. *Samoff* is in some respects not dissimilar to *Kaynard* and might be construed as a § 8(b) (7) (C) proviso case as well.

through mustering the sanctions of organized group discipline—whether an election is pending or has been held and lost. . . . A spillover of long-range tendency to subserve the union interest of ultimate unionization (inseparably implicit, if only as 'vague and speculative hopes,' in any union picketing no matter what its overt purpose or object or word-choice) is not as a matter of law enough to condemn picketing as having 'an object' of forcing recognition or unionization within the opening language of Section 8(b) (7). . . . "

In view of his finding as to the purpose of the new picketing, Judge Dooling permitted it to continue without hiatus or quarantine.

Regrettably for the Union, the *Kaynard* case is clearly distinguishable. We can make no finding here that the Union has abandoned its organizational or recognitional purpose; in *Kaynard*, the union had already lost an election (the vote against it was 26–0), hence the reference to "vague and speculative hopes". What is involved here is more than "spillover"; as we have pointed out several times, the main thrust of the dispute is organization and recognition. Moreover, the § 8(b) (7) (C) proviso is also inapplicable because there is reasonable cause to believe that the effect of the picketing has been to induce the refusal, by various common carriers, to pick up and transport the Company's goods.

Having concluded that the doctrine of "Unclean hands", and the Samoff, etc. v. Building & Construction Trades Council and *Kaynard* cases are inapplicable here,

in view of our finding of a § 8(b) (7) (C) violation, we are not at liberty to decree that picketing limited to protest of the alleged §§ 8(a) (1) and (3) unfair labor practices by the Company may continue with or without a hiatus or period of "quarantine".

## VIII. *Conclusion*

■ In view of the foregoing findings of fact and conclusions of law, we shall, in order to preserve the issues for orderly determination by the Board, grant the requested injunctive relief. As we do so, we make the following observations. The various charges against both the Company and the Union are yet to be heard by the Board, much less resolved. However, in terms of their trial posture before the Board, the parties now have the benefit of an extensive record developed before the Court, which should be a "timesaver". Moreover, while (and perhaps because) the matter has been under the aegis of the Court, a relative calm has prevailed. In this fashion the coercive atmosphere has probably dissolved, thereby accomplishing in advance the desired result of a § 8(b) (7) injunction—to permit the situation to "cool" prior to the holding of an election.[11] Apparently the coercive Company activity which was complained of (§§ 8 (a) (1) and (3)) has also abated during this period. Under these facts, it would seem that nothing need stand in the way of an early election, and we believe that the Board should expedite the disposition of the unfair labor practice charges and the holding of an election in the matter.

11. In view of the failure of the Union to file a § 9(c) petition within a reasonable time, the fact of an interim calm does not, however, permit the resumption of organizational or recognitional picketing, (1) in view of our findings, and (2) in view of the express language of § 8(b) (7).